**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0252-18T1

ANDREW J. SHECHTEL,

     Plaintiff-Appellant/
     Cross-Respondent,

v.

DIRECTOR, DIVISION OF
TAXATION,

     Defendant-Respondent/
     Cross-Appellant.

_____

     Telephonically argued on March 24, 2020 –
     Decided September 3, 2020

     Before Judges Rothstadt, Moynihan and Mitterhoff.

     On appeal from the Tax Court of New Jersey, Docket
     No. 295-2017, whose opinion is reported at 31 N.J. Tax
     89 (Tax 2018).

     John Lindau Berger argued the cause for
     appellant/cross-respondent (Lowenstein Sandler, LLP,
     attorneys; John Lindau Berger, of counsel and on the
     briefs; Kenneth J. Slutsky, on the briefs).

Ramanjit K. Chawla, Deputy Attorney General, argued the cause for respondent/cross-appellant (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Ramanjit K. Chawla, on the briefs).

PER CURIAM

In this appeal, we are asked to determine whether the Tax Court properly interpreted the New Jersey Gross Income Tax Act (Act), N.J.S.A. 54A:1-1 to 54A:10-12, when it held as a matter of law that defendant, the Director, Division of Taxation (Division), correctly determined that a taxpayer, plaintiff Andrew H. Shechtel, could not reduce his taxable distributive share of a partnership's income in 2010 by partnership losses incurred in 2009. According to Shechtel, his 2009 losses could not be applied in 2009 because they exceeded his "at risk" exposure in the specific partnership in 2009, but not in 2010.

The Division contended that the Act was not subject to the "at risk" limitation imposed under § 465 of the United States Internal Revenue Code (I.R.C.) that prevented the loss from being applied until the tax year in which the loss exceeded the partner's at risk amount. The Division maintained that Shechtel should have applied the loss in 2009 and when he failed to do so, he lost the deduction forever and could not recoup it by retroactively applying it to his 2009 income.

Shechtel pursued his claim in the Tax Court and on July 6, 2018, that court issued an order denying his motion for summary judgment, and granting the Division's cross-motion for the same relief, except as to the issue of the interest and penalties imposed by the Division to which it claimed it was entitled because of the improper application of the loss on Shechtel's 2010 return. In support of its order, the Tax Court issued a comprehensive opinion explaining why Shechtel incorrectly relied upon § 465 and therefore was not entitled to the deduction. See Shechtel v. Dir., Div. of Taxation, 31 N.J. Tax 89 (Tax 2018).

Thereafter, Shechtel appealed, arguing to us that the Tax Court incorrectly determined his liability as a matter of law. The Division cross-appealed from the Tax Court's determination that it was not entitled to interest or penalties.

We have carefully reviewed both parties' contentions in light of the undisputed facts and applicable principles of law. For the reasons that follow, we reverse the Tax Court's determination as to Shechtel's tax liability and affirm its determination as to interest and penalties.

I.

The salient facts are not disputed and were cogently described by the Tax Court in its opinion. For context, we repeat them here:

> For tax years 2009 and 2010, [Shechtel] was a member of several entities which were taxed as partnerships.

One such entity was S&S Yield Company, L.L.C. ("SSY") in which plaintiff was a 99% member for tax years 2009 and 2010.

For tax year 2009, [Shechtel] received income from other partnerships totaling $16,858,589. His distributive share of loss from SSY was $14,915,338. Per [Shechtel], pursuant to I.R.C. § 465, he could only use $10,051,551 of this loss (to offset income received from other partnerships) because the total loss exceeded his at risk amount in SSY. The balance of $4,863,787 ($14,915,338 less $10,051,551) was federally disallowed and suspended until such time that he made up or increased his at risk amount in SSY. He therefore reported $6,807,037 (although $16,858,589 minus $10,051,551 equals $6,807,038) as his distributive share of net partnership income on his 2009 [Gross Income Tax (GIT)] return.

For tax year 2010, [Shechtel's] distributive share of passed-through income from other partnerships totaled $18,616,866. His distributive share of loss from SSY was $6,746,831. To this amount, he added the 2009 suspended loss of $4,863,787 (totaling $11,610,718). He then reported his net partnership income on the 2010 GIT return as $7,006,148 ($18,616,866 less $11,610,718). On the NJK-1 issued by SSY, a hand-written notation stated: "[t]here is an additional loss of 4863787 (sic) taken on this 2010 return. It was suspended in 2009 by 'at risk' rule, but allowed now."

[The Division] audited plaintiff's 2010 GIT return about three years after it was filed and denied $4,863,787 of the $11,610,718 claimed loss. It explained that the . . . Act "did not contain a provision for the carryback or carryforward of losses, nor does it recognize the Federal 'at risk' limitations for partnerships," as evidenced by N.J.A.C. 18:35-1.3(d),

4

which requires "any and all" passed-through income/loss to be reported as a partner's distributive share. [The Division] concluded that the "federal suspended loss" for SSY should have been reported by [Shechtel] on his 2009 GIT return, and could not be "carried forward" to tax year 2010.

Due to the disallowance, plaintiff's 2010 reported income increased by $4,863,787, which in turn, increased the GIT due from the reported $622,330 to $1,058,611. [The Division] demanded the difference of $436,281, which with penalty and interest, totaled $540,107. This was despite the fact that for the 2009 tax year, plaintiff reported $1,525,453 as total tax paid (through withholdings and payments), and requested $903,123 (amount withheld/paid less reported GIT due $622,330) be used as a credit towards his 2011 GIT.

[Id. at 93-94.]

In rejecting Shechtel's contentions, the Tax Court first found that there was no basis for his argument that the suspension of his 2009 loss until 2010 was consistent with the Act's mandate that "[a] taxpayer's accounting method under this act shall be the same as his accounting method for Federal income tax purposes." Id. at 95 (quoting N.J.S.A. 54A:8-3(c)). According to the court, the I.R.C.'s limitation on a taxpayer's ability to recognize a partnership loss up to "the aggregate amount with respect to which the taxpayer is at risk . . . for such activity at the close of the taxable year," I.R.C. § 465(a)(1), and then apply any excess over the at risk amount to a subsequent year when the at risk amount was

sufficient, under § 465(a)(2), was not a federal accounting method even though it was included within those sections of the I.R.C. commonly viewed as defining federal accounting methods.  See Shechtel, 31 N.J. Tax at 98.

According to the Tax Court, § 465 was a legislative device to prevent tax shelters and based on its legislative history, was not an accounting method that was to be employed in the calculation of a taxpayer's income for New Jersey GIT purposes.  Id. at 98-100.  The court stated that,

> the crux of I.R.C. § 465 is whether, and how much, is the at risk amount.  The consequent suspension of the deductibility of amounts in excess of the at risk amount is dependent on when and how much of the at risk amount is restored, thus, not an attempt to match the loss incurred with the income earned in the same taxable year, the aim of an overall accounting method.
>
> [Id. at 99-100 (footnote omitted).]

For that reason, the court concluded "that I.R.C. § 465, is a substantive provision, and not merely a timing statute.  Therefore, it is not incorporated into N.J.S.A. 54A:8-3(c)."  Id. at 100.

The court found support for its decision in N.J.S.A. 54A:5-2, which permits the application of losses that "occur within one category of gross income . . . against other sources of gross income within the same category of gross income during the taxable year."  Quoting from Estate of Guzzardi v.

Director, Division of Taxation, 15 N.J. Tax 395, 400 (Tax 1995), aff'd o.b., 16 N.J. Tax 374 (App. Div. 1996), the court stated "[t]his allowance of loss offset requires that the 'items of loss and gross income must occur during the same taxable year.'" Shechtel, 31 N.J. Tax at 101. According to the court, even if § 465 was a federal accounting method, it could not "'control the determination of . . . losses,' especially where N.J.S.A. 54A:5-2 does not incorporate nor reference 'federal accounting methods.'" Ibid. (quoting Guzzardi, 15 N.J. Tax at 404).

The Tax Court stated that "N.J.S.A. 54A:5-2 does not permit a carry-forward of the incurred and passed-through loss of a prior tax year," id. at 103, as the statute was not limited only to allowable loses under the I.R.C., "which [are] not useable solely because there is insufficient income in the same category to absorb such loss," id. at 104. The court concluded "that I.R.C. § 465 via application of N.J.S.A. 54A:8-3(c) does not render N.J.S.A. 54A:5-2 as either inapplicable or as non-controlling," and Shechtel's arguments that he be

> allowed a carry forward of the federally disallowed loss until such time he increases his at risk amount (which could be as here, one year, or for an indefinite period as recognized by I.R.C. § 465) . . . would not only render the loss carry-forward prohibition of N.J.S.A. 54A:5-2 redundant, but would also require that all other anti-shelter provisions . . . also be deemed immune to the application of N.J.S.A. 54A:5-2.

7

[Shechtel, 31 N.J. Tax at 105-06.]

The Tax Court then explained why Shechtel was time barred from recovering the excess GIT he paid in 2009 that was due to his following § 465 and not applying his 2009 partnership losses in full that year even though the result "undoubtedly enriched" the State through Shechtel's payment of more than he should have paid in 2009. Id. at 108. The court concluded that although

> [i]t appear[ed] unjust to retain such an amount when [the Division] does not dispute that the $4,863,787 loss could have offset and reduced plaintiff's 2009 taxable income . . . the inequity of . . . retaining monies mistakenly paid . . . is a necessary corollary to the application of statutes of limitation the basis of which are "for salutary reasons of predictability and repose," as opposed to fairness.
>
> [Id. at 109 (quoting Superior Air Prods. Int'l, Inc. v. Dir., Div. of Taxation, 9 N.J. Tax 463, 477 (Tax 1988))].

In reaching its conclusion, the Tax Court rejected Shechtel's contention that he was entitled to such relief because the Division "never issued any publications, articles, or regulations on the effect of the at risk rules for GIT purposes" because the Act was clear that losses could not be carried forward and no further guidance was necessary. Id. at 110.

A-0252-18T1

Finally, the Tax Court addressed the Division's imposition of interest and penalties on the amount owed by Shechtel as a result of the disallowance of his partnership loss.  In rejecting the Division's attempt to collect those amounts, the court noted that there was no dispute Shechtel paid more than what was owed in 2010, after the disallowance of the carried forward loss, which was originally intended to be applied towards his 2011 liability.  Those excess amounts were available to the Division to apply to any deficiency in 2010.  Therefore, no interest or penalties should have been charged.

Thereafter, the parties filed cross-motions for reconsideration, which the court denied.  This appeal followed.

On appeal, Shechtel challenges the Tax Court's holding that "the at risk rules are not a federal method of accounting that is incorporated into the . . . Act" and that as such they "would violate . . . N.J.S.A. 54A:5-2['s]" ban on carrying over losses from a prior tax year.  He claims that the court "fail[ed] to give effect to all relevant statutory provisions," and it erred by "conclud[ing] that tax shelters are eliminated without adopting the at-risk rules."  Finally, Shechtel argues that the Tax Court erred by refusing to find that "equitable doctrines precluded the imposition of tax."  In its cross-appeal, the Division

contends it was error for the Tax Court to "vacat[e the] interest and penalties" it imposed on Shechtel.

## II.

In considering the Tax Court's decisions on summary judgment motions, our review is de novo employing the same standard as that court. Kite v. Dir., Div. of Taxation, 453 N.J. Super. 146, 152 (App. Div. 2018) (citing Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016)). When reviewing a trial court's order granting or denying summary judgment, we apply the same standard that governs the trial court. Lee v. Brown, 232 N.J. 114, 126 (2018). Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. R. 4:46-2(c). Here, the material facts are not in dispute, and the question raised on appeal is whether the Tax Court erred by finding as a matter of law that the Act barred Shechtel from applying his losses as required by § 465.

In our review, we owe "no special deference to the legal determinations of the [Tax] [C]ourt." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins., 224 N.J. 189, 199 (2016). "Although the Tax Court's factual findings 'are entitled to deference because of that court's expertise in the field,' we need not defer to its interpretation of a statute or legal principles." Advance Hous., Inc.

A-0252-18T1

v. Township of Teaneck, 215 N.J. 549, 566 (2013) (quoting Waksal v. Dir., Div. of Taxation, 215 N.J. 224, 231-32 (2013)).

III.

§ 465

We begin our de novo review by addressing the parties' contentions about the Tax Court's view of § 465 in this case. It is undisputed that this provision of the I.R.C. expressly defines when a partner can apply a qualified loss to reduce his distributive share of partnership income. I.R.C. § 465. Specifically, it provides that "any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year." I.R.C. § 465(a)(1). Under subsection (b)(1), "a taxpayer shall be considered at risk for an activity with respect to amounts including—(A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and (B) amounts borrowed with respect to such activity (as determined under paragraph (2))." I.R.C. § 465(b)(1). Where the loss for any tax year exceeds the at risk amount and is therefore "not allowed under this section for the taxable year[, it] shall be treated as a deduction allocable to such activity in the first succeeding taxable year." I.R.C. § 465(a)(2).

11

If, as Shechtel argues, § 465 is a federal method of accounting, then under N.J.S.A. 54A:8-3(c) of the Act, he properly calculated his 2009 GIT liability by not including the amount of the loss that exceeded his at risk amount and correctly applied it to 2010 when his at risk amount exceeded the loss. That portion of the Act mandates that "[a] taxpayer's accounting method under this act shall be the same as his accounting method for Federal income tax purposes." N.J.S.A. 54A:8-3(c).

Years before Shechtel applied the disputed loss, the Division publicly reinforced the requirement that taxpayers follow federal methods of accounting. Specifically, a 1998 edition of N.J. State Tax News, "a bi-monthly newsletter published by the Division itself," Airwork Serv. Div. v. Dir., Div. of Taxation, 97 N.J. 290, 295 (1984), which is considered an official publication, see Toys "R" Us, Inc. v. Dir., Div. of Taxation, 300 N.J. Super. 163, 172 (App. Div. 1997), contained information about the role of federal accounting methods. It stated the following:

> A taxpayer's method of accounting for Federal income tax purposes determines not only the method to be used to compute income but also determines when income is to be recognized for [GIT] purposes, unless otherwise provided for in the Act or under Regulations. Thus, in most instances, a taxpayer will recognize and report income for [GIT] purposes in the same period as he does for Federal income tax purposes.

[N.J. State Tax News, Winter 1998, at 11.]

The Division reiterated this information in 2000, stating in another edition of its publication that N.J.S.A. 54A:8-3(c) provides that a taxpayer's accounting method under the Act "shall be the same as his accounting method for Federal income tax purposes," and "[a] taxpayer's method of accounting for Federal income tax purposes determines not only the method used to compute income but also determines when income is to be recognized and reported." N.J. State Tax News, Winter 2000, at 4 (emphasis added). Moreover, the Division stated that "[i]f a taxpayer makes a Federal election that allows them to defer recognition and reporting of the income until some future time or event, they may do so for [GIT] purposes." Ibid.

Here, it is undisputed that generally those federal methods of accounting are contained in Part II of the I.R.C. at §§ 446-475, of which § 465 is obviously a part. Those sections are considered federal income tax accounting methods that are incorporated into the Act. See Guzzardi, 15 N.J. Tax at 403.[1] They

---

[1] We view the Tax Court's reliance on Guzzardi to be inapposite. That case did not address the federal accounting methods in Part II of the I.R.C. at §§ 446-475. In that case, the taxpayer argued that the Act "adopt[ed] 'in toto . . . the federal scheme for taxation of capital gains which clearly . . . permits the carry forward of capital losses.'" Id. at 399 (alterations in original). In rejecting that

"constitute the statutory law governing the accounting periods and methods allowable for purposes of calculating income subject to federal income tax. These are substantive provisions prescribing the taxable year . . . in which income (loss) earned and allowable items of deduction paid or incurred will be recognized." Sabino v. Dir., Div. of Taxation, 17 N.J. Tax 29, 35 (Tax 1997). By requiring the application of "federal income tax accounting methods . . . , the Legislature has accepted all accounting methods recognized by the [I.R.C.] and the Regulations[, and its] purpose was to adopt a simple procedure for the determination and timing of income and deductions, in accordance with federal income tax accounting principles." DuBois v. Dir., Div. of Taxation, 4 N.J. Tax 11, 23 (Tax 1981), aff'd o.b., 6 N.J. Tax 249 (App. Div. 1982), aff'd, 95 N.J. 234 (1983).

> "[M]ethod of accounting allowed for federal tax purposes" . . . is not limited to the recognized overall methods of accounting, such as the cash method or accrual method, but rather was intended to include any method or system as used for federal tax purposes 'by which taxpayers determine the amount of their income, gains, losses, deductions and credits, as well as the time when such items must be realized and recognized."
>
> [Baldwin v. Dir., Div. of Taxation, 10 N.J. Tax 273, 284 (Tax 1988) (emphasis added) (quoting 10 Federal

---

contention, the Tax Court specifically noted that it was not "decid[ing] the scope of [a provision in the Act's] reference to federal income tax accounting methods [as it relied upon a] specific, contrary provision [in the Act that it held] controls." Guzzardi, 15 N.J. Tax at 403.

Tax Coordinator 2d ¶ G-2001 at 24, 103-24, 104 (Research Inst. of Am. Dec. 1987 ed.)), aff'd, 237 N.J. Super. 327 (App. Div. 1990).]

By referring to federal accounting methods for income tax purposes, "what was intended was gains or <u>losses</u> that are recognized for federal income tax purposes in accordance with established federal income tax accounting procedures for measuring allowable gains and losses." <u>Id.</u> at 285 (emphasis added).

Applying these well-settled principles about the relation of the federal methods of accounting to the Act, we conclude that the Tax Court here erred when it held that § 465 was excluded from those methods. That section specifically defines <u>when and how</u> the subject losses can be realized and therefore by definition is a federal method of accounting. That determination alone, however, does not resolve the issue. To the extent that another provision in the Act otherwise prevents application of the generally required federal method of accounting, then that provision would control. <u>See</u> <u>Guzzardi</u>, 15 N.J. Tax at 403.

## N.J.S.A. 54A:5-2

In its opinion, the Tax Court here relied upon N.J.S.A. 54A:5-2, which bars the carrying forward of losses, and found that it prevented Shechtel from

applying the disputed loss to his 2010 income, even if § 465 was a federal accounting method. We disagree.

In determining the meaning of this portion of the Act we apply well-settled rules. "In construing a statute, our 'overriding goal is to determine as best we can the intent of the Legislature, and to give effect to that intent.'" Bermudez v. Kessler Inst. for Rehab., 439 N.J. Super. 45, 50 (App. Div. 2015) (quoting State v. Hudson, 209 N.J. 513, 529 (2012)). An agency's interpretation of a statute it is charged with administering should not be upheld if it is "contrary to the evident purpose of the statute." Reck v. Dir. Div. of Taxation, 345 N.J. Super. 443, 448 (App. Div. 2001) (quoting Blecker v. State, 323 N.J. Super. 434, 442 (App. Div. 1999)). "[W]hatever be the rule of [statutory] construction, it is subordinate to the goal of effectuating the legislative plan as it may be gathered from the enactment read in full light of its history, purpose and context." Koch v. Dir. Div. of Taxation, 157 N.J. 1, 7 (1999) (second alteration in original) (quoting State v. Haliski, 140 N.J. 1, 9 (1995)).

"[I]t is a fundamental principle of statutory interpretation that a court 'should try to give effect to every word of the statute, and should not assume that the Legislature used meaningless language.'" Verniero v. Beverly Hills, Ltd., 316 N.J. Super. 121, 127 (App. Div. 1998) (quoting Med. Soc'y of N.J. v. N.J. Dep't of Law

16

& Pub. Safety, 120 N.J. 18, 26 (1990)).  Moreover, "it is well-established that a statute should not be construed in a manner that renders any portion of it a nullity." Smith v. Dir. Div. of Taxation, 108 N.J. 19, 27 (1987).

> When there is a conflict in interpretation, it is well-established that "a legislative provision should not be read in isolation or in a way which sacrifices what appears to be the scheme of the statute as a whole. Rather a statute is to be interpreted in an integrated way without undue emphasis on any particular word or phrase and, if possible, in a manner which harmonizes all of its parts so as to do justice to its overall meaning."
>
> [Koch, 157 N.J. at 7 (quoting Zimmerman v. Mun. Clerk of Berkeley, 201 N.J. Super. 363, 368 (App. Div. 1985)).]

"The first step in determining the Legislature's intent is to look at the plain language of the statute."  Caput Mortuum, L.L.C. v. S&S Crown Servs., Ltd., 366 N.J. Super. 323, 332 (App. Div. 2004).  A statute's plain language serves as "the best indicator" of the Legislature's intent.  DiProspero v. Penn, 183 N.J. 477, 492 (2005).  When we discern the meaning of the Legislature's selected words, we may "draw inferences based on the statute's overall structure and composition."  State v. S.B., 230 N.J. 62, 68 (2017).

"In reading the language used by the Legislature, the court will give words their ordinary meaning absent any direction from the Legislature to the contrary. 'If the plain language leads to a clear and unambiguous result, then [the]

interpretive process is over.'" TAC Assocs. v. N.J. Dep't of Envtl. Prot., 202 N.J. 533, 541 (2010) (alteration in original) (citation omitted) (quoting Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195 (2007)). However, "[w]hen the plain meaning does not point the court to a 'clear and unambiguous result,' it then considers extrinsic evidence from which it hopes to glean the Legislature's intent." Ibid. (quoting Bedford v. Riello, 195 N.J. 210, 222 (2008)). Included within the extrinsic evidence a court may consider "are legislative history and statutory context, which may shed light on the drafters' motives." Ibid.

The plain language of this section of the Act states that losses realized in one tax year cannot be applied to a subsequent year's income. Specifically, the statute states, in pertinent part, that "[l]osses which occur within one category of gross income may be applied against other sources of gross income within the same category of gross income during the taxable year." N.J.S.A. 54A:5-2. Although the statute does not expressly require that loss be taken in the "same" taxable year, "[i]t is firmly established that [N.J.S.A. 54A:5-2] does not allow a taxpayer to apply losses from one tax year to offset income in another tax year." Murphy v. Dir., Div. of Taxation, 26 N.J. Tax 432, 449 (Tax 2012). "Unlike the

A-0252-18T1

[I.R.C.], the GIT Act does not allow for the carry forward or carry back of losses, underlining the annual nature of the State tax."[2] Ibid.

However, the statute assumes that the loss a taxpayer might seek to carry forward is a loss that could be applied under federal accounting methods to an earlier year. And, as already discussed, a loss that exceeds a partner's at risk amount in the endeavor is not cognizable until the year in which the at risk amount is sufficient to allow for the application of the losses. A commonsense reading of the plain language of N.J.S.A. 54A:5-2 requires that there be a loss that, but for the statute, could be carried over if allowed under federal accounting methods. Under federal accounting methods, Shechtel did not have a loss he could fully apply in 2009.

Under the Tax Court's interpretation of the relationship between § 465 as incorporated by N.J.S.A. 54A:8-3, and N.J.S.A. 54A:5-2, partnership losses for the years prior to 2012 could have been unlimited and taken even in years in

---

[2] An exception to the prohibition in carrying forward losses became effective in 2012 and is set forth in N.J.S.A. 54A:3-9. L. 2011, c. 60, § 2. It was enacted to permit taxpayers to carry forward net losses from business-related categories of income and apply those losses "against income in future taxable years." L. 2011, c. 60, § 1. It specifically allows taxpayers to carry forward losses sustained from their distributive share of partnership income and apply those losses against income (albeit, within the same category of income) in subsequent tax years. Ibid.; see also N.J.S.A. 54A:3-9.

19

which a partner had "no skin in the game."  Requiring that before a loss can even be realized it must exceed the partner's at risk amount is consistent with the goals of the Act.  Like § 465, which was designed "to combat what Congress perceived to be an increasing incidence of abuses in tax shelters," Brand v. Comm'r of Internal Revenue, 81 T.C. 821, 828 (1983); see also Shechtel, 31 N.J. Tax at 105, "tax shelter avoidance was [also] a significant legislative objective" of the Act, Smith, 108 N.J. at 30.

It would be antithetical to the Act's purposes if N.J.S.A. 54A:5-2 was understood to require a partner to apply a loss in a tax year where the partner had no exposure.  Stated otherwise, if a taxpayer's right to apply a loss occurred before it exceeded his or her at risk amount was sufficient, the taxpayer who had no at risk amount to lose, would be able to reduce to even zero any "distributive share of partnership income," N.J.S.A. 54A:5-1(k), that would otherwise be taxable, even though he or she never actually realized any loss.  Consistent with the purposes of the Act, the application of § 465 prevents that result by not making a loss allowable only in the year in which the at risk amount is sufficient.

We turn to Shechtel's circumstances here to illustrate the impact of upholding the Tax Court's decision in this case on the purposes of the Act.  As discussed above, Shechtel's distributive share of SSY's loss in 2009 was

$14,915,338 and his at-risk economic amount in SSY was $10,051,551 at the end of 2009. Thus, under the federal income tax methods of accounting stated in § 465, Shechtel could not use his entire distributive share of SSY loss in 2009 to offset his income from other partnerships; rather, he was only permitted to deduct $10,051,551 of his distributive share of SSY loss, representing his amount at risk in SSY in that year.

The remaining $4,863,787, or the SSY suspended loss, was not allowable until plaintiff increased his amount at risk in SSY. However, plaintiff's other partnership income in 2009 was large enough that, if the SSY loss had not been suspended by § 465, plaintiff would have been able to apply the full amount of $14,915,338 against his 2009 partnership income, thereby providing him with a significant tax benefit in 2009. Although Shechtel did not do so because of his belief that § 465 was incorporated into the Act by N.J.S.A. 54A:8-3, such a deduction would have operated as a tax shelter in his favor by allowing him to offset his partnership income by a phantom loss in excess of the actual loss sustained by plaintiff. The benefit derived by such a phantom loss was prevented by the federal at risk rules.

Under the Tax Court's holding, it would have been an allowable tax shelter contrary to the Act's purposes. Thus, the Tax Court's interpretation of the Act

21

would allow income to escape tax, "a result not intended by the Legislature." Walsh v. State, Dep't of Treasury, Div. of Taxation, 10 N.J. Tax 447, 462 (Tax 1989), aff'd o.b., 240 N.J. Super. 42 (App. Div. 1990).

Under these circumstances, we are constrained to reverse the Tax Court's holding in this case and direct that summary judgment be entered in favor of Shechtel and against the Division.

IV.

Recoupment and Mitigation

In light of our determination that Shechtel was entitled to apply his 2009 loss against his 2010 distributive share of partnership income, we need not address at length his contentions about the Tax Court's refusal to allow him to recoup his lost allowable losses. For completeness, we make the following brief observations.

We conclude that even if we were to affirm the Tax Court's decision here, Shechtel should have been allowed to recoup his lost deduction under the "square corners" doctrine, rather than been barred from recovery. We find support in the fact that the Division's official publication continuously reiterated the need to follow the timing provided for recognizing taxable income, which

22

by definition is calculated after applying allowable losses, as stated in the federal accounting methods under the I.R.C.

To hold otherwise would allow the Division to not "turn square corners" to the taxpayer's detriment. See Residuary Trust v. Dir. Div. of Taxation, 28 N.J. Tax 541, 546-47 (App. Div. 2015) (stating "an agency may not spring upon the regulated community a new policy, never before announced, and apply it retroactively"). "The square corners doctrine is particularly important in the field of taxation, because trusts, businesses, individuals and others must be able to reliably engage in tax planning and, to do so, they must know what the rules are." Id. at 548.

It is "fundamentally unfair" for the Division to announce in its official publication that, under a certain set of facts, federal methods of accounting will be applied, "and then retroactively apply a different standard years later." Ibid. "Courts have not hesitated to apply the [square corners] doctrine to preclude the assessment of tax where taxpayers made financial decisions relying on representations by State officials regarding how tax laws will be applied, only to have those officials change position later." Milligan v. Dir. Div. of Taxation, 29 N.J. Tax 381, 400 (Tax 2016). We find the present circumstances to be of the type that entitled Shechtel relief.

However, we reject Shechtel's contention that, even if he was barred by N.J.S.A. 54A:5-2 from applying his 2009 losses to 2010, he was entitled to equitable recoupment. "As an equitable concept, judges invented the doctrine of equitable recoupment in order to avoid an unusually harsh or egregious result from a strict application of a statute of limitations." Superior Air Prods. Int'l, Inc., 9 N.J. Tax at 471. A claim of equitable recoupment must have three essential elements: "(1) a single transaction, (2) an identity of interest among parties, and (3) a need to balance the equities." Id. at 473.

"[A] single transaction, '[is] one involving only a particular item on a tax return or a single event or transaction during the tax period [in question].'" Id. at 474 (third alteration in original) (quoting Nat'l Cash Register Co. v. Joseph, 86 N.E.2d 561, 562 (N.Y. 1949)). Thus, "a claim of equitable recoupment will lie only where the Government has taxed a single transaction, item, or taxable event under two inconsistent theories." Gen. Motors Acceptance Corp. v. Dir., Div. of Taxation, 25 N.J. Tax 428, 439 (Tax 2010) (quoting United States v. Dalm, 494 U.S. 596, 605-06 n.5 (1990)).

The Tax Court here correctly concluded that Shechtel's claim involved two separate transactions so that recovery under equitable recoupment was not permitted. We have no basis to disagree.

24                                                      A-0252-18T1

We also reject Shechtel's contention that the Tax Court should have applied the doctrine of mitigation, under I.R.C. §§ 1311-1314, which according to Shechtel, allows "a taxpayer to correct the effect of an erroneous treatment of an item in a taxable year which is closed by the statute of limitations where, in determining the tax for another taxable year, it is determined that the item was treated erroneously in the closed year."

The problem is the mitigation rules Shechtel cites have not been incorporated into the Act nor applied by New Jersey courts, a fact that Shechtel concedes. The Tax Court rejected plaintiff's argument that mitigation should apply, concluding that Shechtel's "request that this court afford relief similar to the mitigation provisions of I.R.C. § 1313 cannot be entertained as the court cannot engraft a federal statute into the GIT Act." Shechtel, 31 N.J. Tax at 110 n.10. We agree.

It is well-established that the Act is not modeled on the Internal Revenue Code and our Legislature "chose, instead, to create an income tax based on a simpler system, shorn of many of the deductions and credits incorporated in federal law." Murphy, 26 N.J. Tax at 444. Thus, federal tax concepts will not be incorporated into the Act unless "a provision of the GIT Act expressly incorporates" them. Ibid.

"Our tax laws must be interpreted in light of the Legislature's express intent that New Jersey tax law diverge from the federal model in significant respects." Waksal, 215 N.J. at 241. There is no authority in the Act or in our case law that permits a court to apply the mitigation rules relied upon by Shechtel. We have no basis to hold to incorporate those rules into the Act or apply them to this matter.

V.

Interest and Penalties

We also conclude that we have no cause to disturb the Tax Court's determination that interest and penalties were not warranted. We find the Division's arguments to the contrary to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Suffice it to say, we agree with the Tax Court's reliance on Shechtel's overpayment of his taxes in 2010 as reason for interest and penalties not being assessed under the circumstances. The Division's reliance on Shechtel's request to apply any overpayment to a succeeding tax year did not deprive the Division of the ability to apply the payment to the current tax year if needed because if taxes were due, there was no overpayment to be applied in accordance with the taxpayer's instructions.

A-0252-18T1

The mere fact that the Division did not realize that issue until it audited Shechtel's returns in 2014 did not alter that reality.

Affirmed in part; reversed in part and remanded to the Tax Court for entry of an order granting Shechtel's motion for summary judgment and denying the Division's motion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0252-18T1